IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GAVATA KING-FIELDS,

    *Plaintiff*,

    v.                             Civil Action No. ELH-11-1491

ISIAH LEGGETT, et al.,

    *Defendants*.

## MEMORANDUM OPINION

This suit arises from an altercation on October 4, 2010, involving plaintiff, Gavata King-Fields,[1] a detainee at the Montgomery County Correctional Facility ("MCCF") in Boyds, Maryland, and Emily Geller, a fellow detainee. As a result of the incident, plaintiff, then self-represented,[2] filed suit pursuant to 42 U.S.C. § 1983. Three defendants remain: Deputy Warden Susan Malagari, Correctional Specialist Carla Johnson, and Correctional Specialist Karalynn Davis, all of whom worked at MCCF during the relevant time.[3]

---

[1] Because plaintiff has indicated she no longer uses the surname "Fields," I will refer to her as Gavata King. Plaintiff is now incarcerated at the Maryland Correctional Institution for Women ("MCI-W") in Jessup, Maryland.

[2] Plaintiff is now represented by pro bono counsel, pursuant to an Order entered on February 23, 2012. *See* ECF 28, 30. *See also* ECF 31, 32, 33, 34. The Court wishes to thank pro bono counsel for the time and effort he has expended in his representation of plaintiff.

[3] Suit was filed against Montgomery County Executive Isiah Leggett; MCCF Director Arthur Wallenstein; MCCF Warden Robert Green; MCCF Deputy Warden Susan Malagari; MCCF Counselor Carla Johnson; MCCF Security Supervisor Captain Gail David; and MCCF Case Manager K. Davis. Defendants moved to dismiss (ECF 14), which plaintiff opposed (ECF 16). In a Memorandum Opinion and Order dated January 23, 2013 (ECF 17, 18), I granted defendants' motion in part and denied it in part. Specifically, I dismissed all claims as to defendants Leggett, Wallenstein, and Green, but I concluded that plaintiff alleged facts sufficient to survive a motion to dismiss as to defendants Malagari, Johnson, David, and Davis. ECF 17 at 10. I also concluded that, to the extent plaintiff's claims were premised on negligence, such conduct was not actionable. ECF 17 at 12; ECF 18. Additionally, due to plaintiff's subsequent transfer from MCCF, I denied as moot her request for injunctive relief. ECF 17 at 12-13; ECF

Now pending is defendants' motion for summary judgment (ECF 46, the "Motion" or "Mot."), which plaintiff opposes (ECF 56).[4]  In their Motion, defendants note that three claims remain under 42 U.S.C. § 1983: (1) that plaintiff's access to the courts was thwarted; (2) that plaintiff was denied due process during her adjustment proceedings, and (3) that defendants failed to protect plaintiff during her incarceration at MCCF. Mot. at 1-2; *see also* ECF 17 (Memorandum of January 23, 2012).  According to defendants, judgment in their favor is

---

18.  However, I declined to decide defendants' arguments concerning qualified immunity and public official immunity in the context of the motion to dismiss.  ECF 17 at 10-11.

During discovery, the parties stipulated to the dismissal of defendant David.  Further, plaintiff stipulated that she is not raising a claim regarding the medical care she received.  ECF 42; *see also* ECF 43 (Order approving stipulation of dismissal).  And, as discussed, *infra*, defendants rely on qualified immunity in their summary judgment motion on a limited basis.

[4] The Court has reviewed defendants' Motion for Summary Judgment (ECF 46), as well as the accompanying memorandum (ECF 46-1, "Mem."); plaintiff's Memorandum in Opposition to Defendants' Motion  for Summary Judgment (ECF 56, "Opp."); and defendants' Reply to plaintiff's Opposition (ECF 57, "Reply").

Defendants appended 22 exhibits to their Motion.  *See* ECF 46-2 (Defendants' Exhibit List).  The exhibits include, *inter alia*, the deposition of plaintiff (Exhibit 1); a drawing of "pods," used as an exhibit during the deposition of plaintiff (Exhibit 2); the Affidavit of Susan Malagari (Exhibit 6); plaintiff's handwritten adjustment hearing questions (Exhibit 7); plaintiff's Notice of Infraction (Exhibit 9); MCCF Inmate Discipline Policy (Exhibit 8); Recommendation and Report of Administrative Action regarding King (Exhibit 10); a security video from A-Pod, depicting the incident of October 4, 2010 (Exhibit 12, "security video"); the Adjustment Report pertaining to plaintiff and the incident of October 4, 2010 (Exhibit 13); plaintiff's MCCF medical records (Exhibit 14); plaintiff's medical records from MCI-W (Exhibit 15); excerpts from Malagari's deposition (Exhibit 18); excerpts from Johnson's deposition (Exhibit 19); MCCF's Inmate Guidebook (Exhibit 20); excerpts from Davis's deposition (Exhibit 21); and Geller's Notice of Infraction, dated Oct. 4, 2010 (Exhibit 22).

Plaintiff attached 14 exhibits to her Opposition.  *See* ECF 56-2 (Plaintiff's Exhibit List).  They include, *inter alia*, the deposition of plaintiff (Exhibit A); Johnson's deposition (Exhibit B); Davis's deposition (Exhibit C); Malagari's deposition (Exhibit D); a security video from A-Pod, depicting the incident of October 4, 2010 (Exhibit E, "security video"); the Adjustment Report pertaining to plaintiff and the incident of October 4, 2010 (Exhibit F); Recommendation and Report of Administrative Action regarding Geller, Oct. 7, 2010 (Exhibit G); Inmate Medical & Dental Health Request Slip dated October 5, 2010 (Exhibit I); the Affidavit of King (Exhibit J); MCCF Inmate Discipline Policy (Exhibit K); plaintiff's Notice of Infraction, dated Oct. 4, 2010 (Exhibit L); Inmate Request Form, dated Oct. 4, 2010 (Exhibit M); and Recommendation and Report of Administrative Action regarding King (Exhibit N).

warranted as to all three aspects of plaintiff's claims. *Id.* at 2. In her Opposition, plaintiff advised that she is no longer pursuing a claim for denial of access to court. Opp. at 1 n.1; *see also, e.g.*, *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [defendant's] argument" in dispositive motion, "the plaintiff abandons [her] claim."); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (plaintiff's failure to address in opposition brief an argument raised in defendant's opening brief constitutes abandonment of claim).

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion.

## I. Factual Background[5]

Plaintiff was housed as a pretrial detainee at MCCF between May 6, 2010, and October 20, 2010. Deposition of plaintiff, Oct. 22, 2012 ("King Dep.") at 9. She was subsequently convicted of multiple counterfeiting and theft charges, related to the counterfeiting of checks, and is currently serving a sentence of more than 15 years' imprisonment. *See id.* at 8-9.

During plaintiff's detention at MCCF, Malagari was Deputy Warden of Programs and Services. Deposition of Susan Malagari, Jan. 23, 2013 ("Malagari Dep.") at 5-6. Johnson and Davis served at MCCF as Correctional Specialists. Deposition of Carla Johnson, Jan. 23, 2013 ("Johnson Dep.") at 6; Deposition of Karalynn Davis, Jan. 23, 2013 ("Davis Dep.") at 6-7. Davis reported to Johnson, who in turn reported to Malagari. *See, e.g.*, Malagari Dep. at 9.

Of relevance here, MCCF's female inmates are housed in one of two units, known as N2.2 and N2.1. Mem. Exh. 6, Affidavit of Susan Malagari, Feb. 26, 2013, ¶ 3. If necessary, inmates may also be housed in the medical unit. N2.2, known as the Program Pod, is for female

---

[5] The facts have been construed in the light most favorable to plaintiff. In any event, the facts set forth in this section are undisputed, unless otherwise noted.

inmates who have qualified for certain inmate programs and who are classified at the medium or minimum security level. N2.1 is divided into four "pods," designated as A, B, C, and D. Within N2.1, A-Pod is for general population inmates assigned a classification level of medium or maximum security; B-Pod is for general population inmates assigned a classification level of minimum or medium security; C-Pod is pre-placement for inmates who lack medical clearance to return to the general population, have yet to receive their inmate classification assignment, or who are on disciplinary status; and D-Pod is the Crisis Intervention Unit for mental health-high risk/high observation inmates, as well as those inmates on Special Management status.

The pods are separate locations, inaccessible to one another, and a correctional officers' station is situated in the center of the four pods. Each pod has its own doorway separating it from the officers' station, as well as a full glass wall exposing each of the pods to the full view of the officers' station. *Id.*; *see also* King Dep. at 42-44; Mem. Exh. 2 (drawing of pods). Upon plaintiff's arrival at MCCF, she was initially assigned to N2.1's A-Pod. King Dep. at 13.[6]

Plaintiff met detainee Emily Geller upon entering MCCF. King Dep. at 11-12. Plaintiff prayed with Geller and assisted her with legal work. *Id.* at 12. Around mid-September 2010, plaintiff met another inmate, Patricia Torry, who was new to MCCF and was assigned to A-Pod. *Id.* at 12-13. Within a week after arriving at MCCF, Torry began writing letters to plaintiff and expressed interest in a "'gay' female relationship" with her. *Id.* at 13-14. Although plaintiff would talk to Torry and give her snacks, she was not interested in a relationship with Torry and

---

[6] While temporarily housed in the pre-placement unit upon arriving at MCCF, plaintiff was disciplined for sending prohibited "jail mail" to another inmate. As a result of that violation, she was assigned to a higher-security housing unit than she otherwise would have been. *See* Davis Dep. at 23-25. Subsequently, plaintiff violated institutional rules for possessing "contraband"—lip gloss and eyeliner—and, as a result, was removed from a "moral reconation therapy program." *Id.* at 25-26. As discussed, *infra*, at the summary judgment stage plaintiff has abandoned any challenge to her housing classification at MCCF.

would "laugh it off." *Id.* at 13-14, 20. Plaintiff acknowledged that she corresponded with Torry through "jail mail" letters, which she knew to be in violation of MCCF rules. *Id.* at 20.

Shortly after Torry's arrival in A-Pod, Geller was also transferred there from the Crisis Intervention Unit (the "CIU"). *Id.* at 14-15, 19. Geller had been assigned to the CIU after displaying suicidal behavior. *Id.* at 20. Within days of her transfer to A-Pod, Geller began "to express an interest" in Torry. Soon, the two began to sit in a corner, away from the unit's other inmates, whispering to one another. *Id.* at 14-16.

During an "outburst" on September 22, 2010, Torry accused plaintiff of reporting her to a correctional officer for passing notes with Geller. *Id.* at 16. Torry stated plaintiff was "hot," which, plaintiff explained, meant she was a "snitch." *Id.* Geller and other inmates were present for this exchange, but Geller said little and "didn't really even take a stand." *Id.* at 17. Plaintiff testified at her deposition that although she was concerned for her safety after being "labeled a snitch," she did not perceive a threat from any particular inmate. *Id.* at 17-18. At the time of her deposition, plaintiff could not recall having reported the September 22 incident to any MCCF staff member. *Id.* at 22.

On the morning of September 23, 2010, while the inmates were located in A-Pod's "day room" common area, plaintiff spoke with a friend on the telephone, approximately 12 feet from Geller and Torry. *Id.* at 22-25. Torry approached plaintiff and began "cussing [her] out," saying, among other things, that someone should "F [her] up" for being a "snitch." *Id.* at 26-27. Geller also became involved, cursing at plaintiff. *Id.* at 27-28. Plaintiff argued with them, using "inappropriate" language as well. *Id.* at 28. As a result of this incident, plaintiff, Geller, and Torry were each placed on a 24-hour cell restriction, in separate cells. *Id.* at 28-29.

While on lockdown, plaintiff could hear Torry shouting at her from her nearby cell, saying: "'[W]hen I get out tomorrow, I'm going to do X, Y, and Z to this B.'" *Id.* at 31. In response, plaintiff collected letters she had received from Torry and waved them near her door, threatening to turn in the letters to get Torry in trouble. *Id.* at 31-35. Plaintiff could also hear Geller yelling, but could not understand what she was saying. *Id.* at 35-36. During the lockdown, plaintiff was in fear for her safety, from both Geller and Torry. *Id.* at 29-30. Accordingly, she pressed an emergency button located in her cell and asked an officer on security rounds, "Ms. Baker," to stop and talk with her. *Id.* at 32. However, neither Baker nor any other officer responded. *Id.*

Further, while on lockdown after the incident of September 23, 2010, plaintiff wrote letters to Malagari or "Captain David." *Id.* at 29-30, 40.[7] Although plaintiff could not recall the exact contents of those letters, she had explained the situation and indicated that she felt threatened by Geller and Torry. *Id.* at 40.[8] Plaintiff could not recall writing any similar letters describing threats prior to September 23, 2010. *Id.* at 40-41.

On the morning of September 24, 2010, after the 24-hour lockdown was over, Torry came to plaintiff's cell and told plaintiff that she "didn't have any problems" with her. *Id.* at 37. At her deposition, plaintiff indicated that, at the time, she believed Torry's statement that they "were okay." *Id.* at 39.

In the afternoon of September 24, in response to plaintiff's letter from the previous day, Davis visited plaintiff's cell and moved plaintiff to administrative segregation in D-Pod. *Id.* at 41-42; 44; Davis Dep. at 64. Although plaintiff acknowledged that she was transferred for her

---

[7] Gail David is the MCCF official frequently referred to in the briefing and exhibits as "Captain David." *See* ECF 43.

[8] Because plaintiff lacked access to a photocopier, she does not have a copy of that letter. *Id.*

own protection, administrative segregation amounted to a 23-hour lockdown, so plaintiff felt as though she was being punished.  King Dep. at 41, 44-45.

Plaintiff wrote a letter to Captain David on September 25, 2010, asking to be removed from administrative segregation.  *Id.* at 45-47.[9]  At her deposition, plaintiff recalled that she wrote "about Torry and I having the discussion the morning before, and that she said that she didn't have any problems with me."  *Id.* at 47.  Plaintiff also said that, while she was "begging" to be removed from administrative segregation, she felt as though it was safe to return even with Torry and Geller remaining there.  *Id.* at 48.  In support of her request to leave administrative segregation, plaintiff signed a release stating that she felt safe to return to A-Pod.  *Id.* at 49.  Based on her request, plaintiff was removed from administrative segregation on the afternoon of September 28, 2010, and returned to A-Pod. *Id.* at 49.  Plaintiff asserts that no MCCF officials conducted any investigation or followed up with her to confirm that she felt safe upon returning to A-Pod, and defendants do not contest that point.  *See, e.g.*, Johnson Dep. at 15-16.

Although Torry had remained in A-Pod, plaintiff discovered upon returning that Geller had been transferred from A-Pod to other housing.  King Dep. at 49, 51.  Tensions with Torry persisted on September 28.  When another inmate approached plaintiff to speak with her, Torry warned the inmate to "'stay away from that hot B,'" and continued to call plaintiff names for the remainder of the afternoon.  *Id.* at 52.  At her deposition, plaintiff stated that, at that point on September 28, she was in fear of Torry.  *Id.* at 53.  Although plaintiff did not notify the corrections staff on September 28 of her concerns, she wrote another letter to Johnson and Captain David, and placed the letter into the inmate mailbox on the morning of September 29.

---

[9] As with the September 23 letter, plaintiff has no copy of that letter because she lacked access to a photocopier.  *See id.* at 45-46.

*Id.* at 54-56. Plaintiff described the incident, but could not recall whether the letter specifically stated that she was afraid, nor did she recall asking them to do anything in particular. *Id.* at 55.

On the morning of September 30, 2010, Torry came to plaintiff's cell and explained that she (Torry) was being placed on lockdown until October 4 as discipline for writing "jail mail" letters. *Id.* at 56-57. According to plaintiff, Torry was not mad, and although plaintiff did not know why Torry had come to speak with her, she speculated that she may have been the only person on the unit Torry felt she could tell. *Id.* at 57-58. The "jail mail" letters that resulted in the discipline were not ones exchanged by plaintiff and Torry; plaintiff "had nothing to do with it." *Id.* at 58. At that point, plaintiff did not fear Torry, nor did she indicate to correctional staff that she feared Torry's return from lockdown on October 4. *Id.*

On October 2 or 3, 2010, Geller returned to A-Pod from disciplinary segregation, which resulted from an incident unrelated to plaintiff. *Id.* at 59. Geller visited plaintiff's cell, and the two had what plaintiff described as a "girls' session where we just talked about all of the lies that Torry had been mixing up between she and I." *Id.* at 61. Plaintiff showed Geller the letters from Torry, in an effort "to bring back peace between she and I." *Id.* Plaintiff testified that, as a result of that conversation, she did not fear Geller, and believed she had resolved any problems with Geller. *Id.* at 60, 62.

According to plaintiff, two other inmates told her that Geller and Torry had spoken on October 3, while Torry remained on lockdown. Specifically, Geller told Torry that plaintiff had shown her the letters that remained in plaintiff's possession. *Id.* at 63-66.

On October 4, 2010—the day Torry was scheduled to return to A-Pod—plaintiff was summoned to Davis's office. *Id.* at 69. Torry, Johnson, and another officer, Captain Harold Payne, were also present. *Id.* at 71-72. Plaintiff learned that Torry had requested the mediation.

In plaintiff's view, Torry's request for the mediation was an attempt to put "everything out in the air so that [the] situation [with plaintiff] could be resolved." Torry also sought to turn in additional "jail mail" letters, written by Torry and in plaintiff's possession, so that Torry could avoid further discipline and "come off of lock[down] with a clean slate." *See id.* at 72-73.

In the course of the mediation, plaintiff and Torry told their versions of the recent events. *Id.* at 74. Plaintiff acknowledged that she still had letters written by Torry, who did not want her to have them any longer. At the suggestion of Davis, plaintiff agreed to retrieve the letters. *Id.* An MCCF official, Officer Frazier, escorted plaintiff to her cell. As they returned to the mediation, other inmates, including Geller, observed plaintiff carrying the letters. Plaintiff explained that the inmates would not have known that Torry had requested their surrender. *See id.* at 74-76. In the latter portion of the mediation, Torry stated several times, regarding plaintiff: "'This B is a snake, and do you know what you do with a snake? You take a snake and you chop its head off.'" *Id.* at 77.

As a result of the mediation, Davis concluded that although a more restrictive designation of plaintiff and Torry as "separatees" was unwarranted, they nevertheless should be assigned to different pods. *Id.* at 78-79. At her deposition, plaintiff stated she was satisfied with that outcome, and that she felt it was a safe solution for her. *Id.* at 79. Davis's decision was effective immediately, so Torry was transferred from lockdown directly to B-Pod, rather than back to A-Pod. *Id.* at 79-80.

As plaintiff returned to A-Pod following the mediation, the other inmates were in the process of locking down after lunch. *Id.* at 80. At that time, Geller yelled insults at plaintiff, along the lines of "'that's F'ed up B. Oh, you're going to get yours.'" *Id.* at 80-81. However,

plaintiff acknowledged that, between the time she was locked in until dinner that evening, she did nothing to address any fear of Geller. *Id.* at 81-82.

Subsequently, plaintiff and Geller, along with the five or six other inmates in A-Pod, gathered in the day room for dinner. *See id.* at 84. At her deposition, plaintiff testified that she was "fearful" because of the "whole environment" at that time, when "it was clear that everybody was mad at me for giving up Torry's letters and being a snitch." *Id.* at 96. However, at no time did plaintiff approach the guard window overlooking the day room, to express concern or request to be placed in protective custody. *Id.* at 100-01. Further, although the inmates could sit where they chose, plaintiff sat with her back to Geller. *Id.* at 92.

As the inmates ate, plaintiff began discussing the mediation that occurred earlier that day, within earshot of Geller. Plaintiff explained that the mediation took place at Torry's request. *Id.* at 83, 92-93. When plaintiff explained that Davis had decided to house Torry in B-Pod, Geller "went off," stating: "I don't believe this B. My MF'ing girl can't come back over here[.]" *Id.* at 93; *see also id.* at 94 ("It didn't seem that Geller became that enraged until she realized that Torry wasn't coming back on the unit with her."). Plaintiff testified that, in response, she told Geller: "'Emily, you need to calm down and focus on your case. You're about to go to court, you know. I'm not going to argue with you. You're the age of my child.'" *Id.* at 94.

Plaintiff recalled that Geller then stood up, followed by plaintiff, and the two "argu[ed] back and forth in each other's face[s.]" *Id.* Geller struck plaintiff, and the two became entangled in a nearby exercise bike. *Id.* Plaintiff testified, *id.*:

> So, we're going back and forth fighting, and then Emily punches me in the lip, and blood just start[s] gushing everywhere. I took my hand and looked at it, you know, to see where the blood was coming from, and when I saw it was coming from my mouth, I went to cover myself. And that's when Emily struck me again, got me down, dragged me, and just began to keep punching me in the face, dragging me through my blood and kicking and kneeing me.

- 10 -

In discovery, defendants produced the security video of the fight, which also contains a time-stamp reflecting the duration of the incident and the timing of the MCCF staff's intervention. *See* Mem. Exh. 12 (security video from A-Pod.). The video depicts a seemingly hostile exchange of words between Geller and plaintiff while they are seated at adjoining tables. Defendants describe the security video as follows, *id.*:

> The video shows that Geller stood up at 16:57:14; Plaintiff stood up at 16:57:15; Geller and Plaintiff bumped chests at 16:57:18; Plaintiff chest-bumped Geller backwards at 16:57:19; Plaintiff again chest-bumped Geller backwards at 16:57:20; physical fighting began at 16:57:21; Officer Tarner entered the pod at 16:57:30 to break up the fight; and the remaining emergency response team began entering at 16:58:19.9[.][10]

Although plaintiff characterizes these incidents differently than do the defendants, she does not dispute this general timeline. Notably, the parties offer contrasting portrayals of the response by Officer Tarner, the MCCF official present in the guard station adjoining A-Pod's day room. In plaintiff's view, Officer Tarner "showed no immediate concern for King's safety," "nonchalantly walked into the day room without any sense of urgency or concern for King's well-being," and observed the altercation "from afar as the inmates fought and made no effort to intervene even while Geller dragged King across the floor and repeatedly punched her." Opp. at 18. Defendants, by contrast, emphasize that Officer Tarner entered the day room unaccompanied by other officers, putting herself at risk and acting in violation of MCCF policy, which dictated that she should have waited for other officials to arrive, rather than attempted to intervene on her own. Mem. at 12 n.9.

The altercation ended when the "emergency response team came in, grabbed [Geller], put their foot in her back, and locked her up." King Dep. at 103. Plaintiff was escorted to the

_____

[10] I have reviewed the security video and it is generally consistent with this description. It does not include any sound.

medical unit and provided with ice. *Id.* She was then transferred to disciplinary segregation pending an adjustment hearing to face charges for four infractions arising from the incident. *Id.* at 105. Geller was also charged with infractions as a result of the incident. Mem. Exh. 22 (Geller's Notice of Infraction, dated Oct. 4, 2010).

Plaintiff's medical records from MCCF indicate that, following the fight on October 4, 2010, plaintiff had two small cuts on her bottom lip, experienced "slight swelling" as a result of being punched in the eye, and had "minimal bleeding" that was "well controlled." Mem. Exh. 14. Because of "light swelling" on the left side of her face and nose, plaintiff was given ice. *Id.* On an Inmate Medical & Dental Health Request Slip dated October 5, 2010, *i.e.*, the day after the altercation with Geller, plaintiff reported pain in her left eye, stating that "it hurts to move [her] eye-ball around," and that her "whole body is aching," including her neck, back, and the bridge of her nose. Opp. Exh. I. Plaintiff was seen again the following day, October 6; her records note a "small jagged superficial laceration" on her lower lip, but indicate that no bruising or cuts appeared elsewhere on her face. Mem. Exh. 14. Although plaintiff reported pain in her left eye, she declined to take Tylenol. *Id.* At her request, plaintiff underwent a series of nasal and facial x-rays on October 11, 2010, all of which were negative. *Id.*

On October 23, 2010, three days after plaintiff's transfer to MCI-W in Jessup, Maryland, she underwent a physical intake examination. Mem. Exh. 15 (plaintiff's MCI-W medical records). Those records make no mention of visible external injuries, nor do they note any complaints raised by plaintiff concerning vision problems or headaches. *Id.* At her deposition, however, plaintiff stated that she reported vision problems to MCI-W staff during the intake process, and again during her first several months there. King Dep. at 137-38.

At her deposition, plaintiff maintained that, following the incident, she experienced "very bad headaches," "knots to [her] head," and blurred vision. King Dep. at 131. She claimed that, on the date of her deposition (October 22, 2012), more than two years after the altercation, she continued to experience double vision. *Id.* at 131-32.[11]

Plaintiff's adjustment hearing was held on October 6, 2010. Johnson Dep. at 36-37. Defendant Johnson conducted the adjustment hearing for plaintiff, as well as a separate adjustment hearing for Geller. *Id.* at 42. In advance of the hearing, plaintiff was permitted to identify witnesses she wished to appear on her behalf, and designated two individuals: Dana Johnson ("Dana") and Dina Lemus.[12] King Dep. at 109. Plaintiff acknowledged that she received and signed a copy of the charges brought against her. *Id.* at 111. She declined representation in connection with the adjustment hearing. *Id.* at 109, 110; Opp. Exh. L (plaintiff's Notice of Infraction, dated Oct. 4, 2010, stating that plaintiff did not want to be represented).

Prior to the hearing, plaintiff compiled a list of questions that she intended to ask of her witnesses at the hearing. King Dep. at 111. Defendants emphasize that plaintiff did not submit the questions to MCCF staff to ask of the witnesses, as she believed her witnesses would be present at the hearing. *Id.* at 111-112. On an Inmate Request Form dated October 4, 2010, bearing a notation of "Attn: Ms. C. Johnson," plaintiff asked defendant Johnson to speak with her before the adjustment hearing, and to review the security video prior to the hearing. Opp.

_____

[11] The parties offer contrasting characterizations of plaintiff's injuries; plaintiff states that she "sustained substantial injury," Opp. at 6, but defendants dispute that claim, emphasizing that plaintiff "has identified no experts in the matter" and has provided "no evidence" and "no medical documentation" to support her claim of serious injury. Mem. at 15.

[12] Although the transcript uses the spelling "Deanna," with "Deena" also appearing in the submissions, I use "Dina," the spelling used by the parties in the briefing. Additionally, I will frequently refer to Dana Johnson as "Dana," to distinguish her from defendant Johnson (occasionally referred to as "defendant Johnson" for clarity).

Exh. M (Inmate Request Form dated Oct. 4, 2010). The Inmate Request Form makes no mention of witnesses or witness questions, but, in her Affidavit, plaintiff states that her purpose in requesting to speak with defendant Johnson was to "submit questions to be asked of the witnesses." Opp. Exh. J, King Affidavit, July 12, 2013 ("King Aff.") ¶ 5.

MCCF maintains an Inmate Discipline Policy (designated as "policy no. 1200-7"), the applicable version of which became effective July 26, 2009. *See* Mem. Exh. 8; Opp. Exh. K (MCCF Inmate Discipline Policy). Regarding witnesses at adjustment hearings, the policy states, in part, *id.* at 9-10:

> The inmate shall be given an opportunity to call witnesses in his/her defense, provided institutional security or safety would not be jeopardized. The Chairperson [of the Inmate Adjustment Committee] shall call those witnesses (staff or inmate) who are reasonably available, and who are determined by the Chairperson to be necessary for an accounting of the circumstances surrounding the charge(s). In order to lessen the possibility of witness intimidation, the accused inmate shall not be permitted to directly question the witnesses. The members of the Adjustment Committee shall question the witness in private and include any questions raised by the accused. Witnesses whose testimony would be repetitious or irrelevant need not be called. Unavailable witnesses may be asked to submit written statements; however, there must be good reason for not calling a witness in person. The justification of this action shall be documented. An inmate may rescind his/her request for witnesses by initialing the appropriate space provided on the DCA-71.

When plaintiff arrived at the adjustment hearing, she learned that her witnesses would not be present. King Dep. at 112-13. However, Johnson had previously interviewed one witness, Dana Johnson; the other witness, Dina Lemus, had left MCCF on temporary release, and thus was unavailable. Johnson Dep. at 39-40. According to plaintiff, defendant Johnson had not advised her that one of the two witnesses would be unavailable; if she had done so, plaintiff says, she would have identified an additional witness to testify on her behalf. King Aff. ¶ 6. Although defendant Johnson noted in the Recommendation and Report of Administrative Action that Lemus was unavailable due to her temporary release and that Dana had been interviewed prior to

the hearing, Johnson did not explain why Dana was not called as a live witness or what she had stated at her interview. Mem. Exh. 10; Opp. Exh. N (Recommendation and Report of Administrative Action, Oct. 8, 2010).

At the adjustment hearing, plaintiff was found guilty of all four infractions with which she had been charged, and she was sentenced to 30 days of disciplinary lockdown. *Id.* at 114-15. Plaintiff appealed her convictions, and one of the four guilty findings was overturned by MCCF's Warden. *Id.* at 115-16. At her deposition, plaintiff acknowledged that, during the hearing, she was "given a full opportunity to tell [her] version of what happened on" October 4, 2010. *Id.* at 113. Nevertheless, plaintiff explained that her due process claim is premised on her inability to present the testimony of her witnesses. *Id.*

Additional facts are included in the Discussion.[13]

## II. Standard of Review

Defendants' summary judgment motion is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" establishing a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th

---

[13] Defendants' opening memorandum also recounts facts that relate only to plaintiff's claim concerning denial of access to court. *See* Mem. at 13-14. It is unnecessary to recount those facts, as plaintiff has abandoned that claim. *See* Opp. at 1 n.1; *Ferdinand-Davenport*, *supra*, 742 F. Supp. 2d at 777; *Mentch*, *supra*, 949 F. Supp. at 1247.

Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *accord Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). In other words, the non-moving party must show disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U. S. at 247-48 (emphasis in original).

In resolving a summary judgment motion, the court may not make credibility determinations. *Black & Decker Corp. v. United States*, 436 F. 3d 431, 442 (4th Cir. 2006). Moreover, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there exists a dispute of material fact that precludes summary judgment. *Id.* at 248.

### III. Discussion

#### A. Failure-To-Protect Claim

Defendants argue that they are entitled to summary judgment on plaintiff's failure-to-protect claim. *See* Mem. at 34-43. Plaintiff disagrees, arguing that disputes of material fact exist that preclude summary judgment. Opp. at 16.

1.  Legal standard

Title 42 U.S.C. § 1983 establishes a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

It is well settled that pretrial detainees, such as plaintiff, "retain at least those constitutional rights [held] by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *accord Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). A failure-to-protect claim brought by a pretrial detainee constitutes a due process claim under the Fourteenth Amendment, but the same standards apply as for an Eighth Amendment claim brought by a convicted prisoner. *See, e.g.*, *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Grimes v. Warden, Baltimore City Detention Center*, 2012 WL 2575373, at *1 n.2 (D. Md. June 29, 2012) (Bredar, J.); *Eastman v. Warden, Baltimore City Detention Center*, 2011 WL 210343, at *2 n.3 (D. Md. Jan. 21, 2011); *accord Smith v. Sangamon County Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013); *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 & n.1 (11th Cir. 2013); *Ervin v. Mangum*, 127 F.3d 1099 (Table), 1997 WL 664606, at *4 (4th Cir. 1997).[14]

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Under the test set forth in *Farmer*, the deprivation "must be, objectively, sufficiently serious," such that

---

[14] Because the parties and relevant authority frequently refer to the Eighth Amendment standard, I will occasionally do the same.

the inmate "is incarcerated under conditions posing a substantial risk of serious harm." *Id*. at 834 (citations and quotation marks omitted). And, the "prison official must have a sufficiently culpable state of mind," which amounts to "deliberate indifference to inmate health or safety[.]" *Id.* (citations and quotation marks omitted); *accord Odom v. S.C. Dep't. of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003).

In *Farmer*, the Supreme Court clarified that "deliberate indifference" exists only where "the official knows of and disregards an excessive risk to inmate health or safety[.]" 511 U.S. at 837. Under that standard, a plaintiff must make two showings. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). First, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists[.]" *Farmer*, 511 U.S. at 837. Under that prong, "[i]t is not enough that the officers *should have* recognized it; they actually must have perceived the risk." *Parrish ex rel. Lee*, 372 F.3d at 303 (emphasis in original). Second, the official "must also draw the inference." *Farmer*, 511 U.S. at 837. That is, "the evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee*, 372 F.3d at 303 (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). In other words, "'[d]eliberate indifference requires a showing that the defendants *actually knew of* and *disregarded* a substantial risk of serious injury to the detainee . . . .'" *Id.* (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001)) (emphasis added in *Parrish*).

A showing of negligence "does not give rise to a constitutional claim when the operative standard is 'deliberate indifference.'" *Brown*, 240 F.3d at 391. As the Supreme Court explained in *Farmer*, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the

infliction of punishment." 511 U.S. at 837. Similarly, the Fourth Circuit has said: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). *See also, e.g.*, *Goodman*, 718 F.3d at 1332 ("[T]he deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of conduct sounding in negligence . . . ."); *Parker v. Maryland*, 413 F. App'x 634, 638 (4th Cir. 2011) (subjective "deliberate indifference" assessment "'sets a particularly high bar to recovery'") (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)); *Borello v. Allison*, 446 F.3d 742, 749 (7th Cir. 2006) (stating that "[m]ere negligence or even gross negligence does not constitute deliberate indifference," and a failure to protect amounts to a constitutional violation "only if deliberate indifference by prison officials [to the prisoner's welfare] effectively condones the attack by allowing it to happen") (quotation marks omitted; modifications in *Borello*); *Rice v. Austin*, 2003 WL 23350252, at *3 (D. Md. Feb. 20, 2003) ("Unless a prison official actually makes this inference, he does not act with deliberate indifference even where his actions violate prison regulations or can be described as stupid or lazy."); *Nichols v. Maryland Correctional Institution-Jessup*, 186 F. Supp. 2d 575, 581 (D. Md. 2002) (Chasanow, J.) (stating that deliberate indifference is "a high standard to meet" and that a "defendant who unsoundly, stupidly, or negligently fails to appreciate the risk is not liable . . . .") (citing *Rich*, 129 F.3d at 340).

Notably, the Supreme Court concluded in *Farmer* that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844; *accord Brown*, 240 F.3d at 390-91. The Eighth Amendment requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping

dangerous [people] in safe custody under humane conditions[.]" *Id.* at 845 (citations and quotation marks omitted). Accordingly, "prison officials who act reasonably cannot be found liable" under the Eighth Amendment. *Id. See also, e.g.*, *Prater v. Dahm*, 89 F.3d 538, 542 (8th Cir. 1996) (summary judgment for defendants proper where they were aware of risk to plaintiff but took reasonable steps to address the risk); *Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (officer who responds reasonably to danger to inmate not liable under Eighth Amendment, even where further precautions could have been taken but were not); *Stritehoff v. Green*, 2010 WL 4941990, at *3 (D. Md. Nov. 30 2010) ("An officer who responds reasonably to 'the risk of which he actually knew' is not liable for deliberate indifference.") (quoting *Brown*, 240 F.3d at 390-91).

## 2. "Deliberate indifference" by defendants[15]

The central issue is whether the conduct of the remaining defendants amounted to "deliberate indifference." As discussed above, the "deliberate indifference" standard requires a showing of actual knowledge of a substantial risk on the part of a defendant prison officer, as well as disregard of that risk. *See Parrish ex rel. Lee*, 372 F.3d at 303. Therefore, a court must assess the subjective knowledge of an individual officer. In *Brown*, *supra*, 240 F.3d at 390, the Fourth Circuit explained: "In determining the substantiality of the risk that [one defendant officer, among several] knew, and the reasonableness of his response to it, we must consider everything that he was told and observed." *See also, e.g.*, *Bishop v. Hackel*, 636 F.3d 757, 768 (6th Cir. 2011) ("[W]e must focus on whether each individual Deputy had the personal

---

[15] Defendants argue, *inter alia*, that plaintiff's claim fails because she has not shown that her injuries were sufficiently serious to sustain liability. *See* Mem. at 36-38. However, defendants cite no failure-to-protect cases from the Fourth Circuit establishing that a *de minimis* injury is fatal to a failure-to-protect claim. And, as noted above, plaintiff offers a differing account of the severity of her injuries. I need not decide whether the extent of plaintiff's injuries presents a barrier to liability, as I resolve the failure-to-protect claim on other grounds.

involvement necessary to permit a finding of subjective knowledge."); *Dale v. Poston*, 548 F.3d 563, 570 (7th Cir. 2008) (court must examine "what the officer knew and how he responded"); *Grieveson v. Anderson*, 538 F.3d 763, 777-78 (7th Cir. 2008) ("Also problematic for [plaintiff] is his failure to tie actions of the named defendants to the injuries he allegedly suffered . . . . Vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants.").

*Odom*, *supra*, 349 F.3d 765, in which the Fourth Circuit reviewed a district court's grant of summary judgment as to several prison guards, is also instructive. *Id*. at 771-72. In that case, the Fourth Circuit assessed, in the light most favorable to the non-moving party, the evidence regarding the knowledge of each defendant officer. *Id*. Because plaintiff brings failure-to-protect claims against all three remaining defendants, I will adhere to the approach used in *Odom* and *Brown*, and evaluate each defendant's conduct in the context of the information shown to be known to her.

Turning first to Malagari, plaintiff asserts that she "had written to Defendant Malagari advising that she felt threatened by Torry and Geller." Opp. at 17 (citing King Dep. at 40). The letter to which plaintiff refers is that of September 23, 2010, which, as plaintiff testified, "would have been to Ms. Malagari or Captain David." King Dep. at 40. Assuming that Malagari either received the September 23 letter or learned of its contents, it is undisputed that MCCF officials responded to the letter by transferring plaintiff to administrative segregation, for her protection. At her own request, plaintiff voluntarily left administrative segregation on September 28.[16] In

---

[16] According to Malagari's deposition testimony, she would not have had to approve plaintiff's transfer to administrative segregation, but would have received notification after the fact. Malagari Dep. at 44-45, 49-50. Likewise, Malagari testified that she would not necessarily have had to approve plaintiff's release from administrative segregation. Although she would

her Opposition, plaintiff points to no other knowledge or action by Malagari regarding the failure to protect her; Malagari is not alleged to have been aware of or involved in any subsequent events, including those leading up to the October 4 altercation. As a result, the evidence falls far short of showing "deliberate indifference" on the part of Malagari.

Regarding Johnson, plaintiff notes that "King wrote a second letter, addressed to Defendant Johnson, advising of the problems less than one week prior to the attack, but Defendants took no action." Opp. at 17 (citing King Dep. at 54-55). Although no party has produced a copy of that letter, written on September 28, 2010, and sent the following day, plaintiff testified that it was addressed to defendant Johnson and Captain David. According to plaintiff, the letter described her concerns regarding Torry. King Dep. at 55. There is no suggestion that the letter mentioned Geller, who at that time was not residing in A-Pod. Furthermore, Torry was also transferred to lockdown shortly thereafter, on September 30, as discipline for a "jail mail" infraction unrelated to her correspondence with plaintiff. *Id.* at 56-57. And, Torry spoke with plaintiff at her cell shortly before her transfer to lockdown; plaintiff acknowledged that at that time she did not fear Torry, who in any event never returned to A-Pod prior to the altercation between plaintiff and Geller. *Id.* at 58.

Johnson was also present at the mediation involving plaintiff and Torry held on October 4, 2010, which she attended at Davis's request. Johnson Dep. at 25. At the mediation, plaintiff only expressed concern about her safety with regard to Torry; Geller was not discussed. Johnson Dep. at 19, 29-32. Further, Johnson testified that she was unaware that plaintiff had ever said she felt threatened by Geller, *id.* at 32, nor did Johnson know why plaintiff had been placed in administrative segregation on September 23. *Id.* at 20. Plaintiff cites no evidence to the

have later been notified of plaintiff's removal from administrative segregation, she could not recall being involved in that decision as to plaintiff. *See id.* at 46-47.

contrary.  In short, the record is devoid of any indication that, prior to the incident on October 4, 2010, Johnson was aware of a danger posed to plaintiff by Geller.  In the light most favorable to plaintiff, the facts at most reflect Johnson's awareness of plaintiff's concerns regarding Torry, who was transferred out of A-Pod on September 30, 2010, and never returned prior to the October 4 altercation.  As with Malagari, the evidence cannot sustain a finding of "deliberate indifference" on the part of Johnson.

As for Davis, plaintiff argues that her "knowledge of the threats is evidenced by the fact that she placed King in administrative segregation prior to the attack due to King's continued safety concerns."  Opp. at 17 (citing King Dep. at 41).  At her deposition, Davis stated that Captain David asked her to move plaintiff from A-Pod to administrative segregation.  *See* Davis Dep. at 58-59.  Davis further testified, however, that she played no role in deciding whether to place plaintiff in administrative segregation, and that Captain David never told her "specifically" why plaintiff was being moved.  *See* Davis Dep. at 58-59; *see also id.* at 57 (asserting that she is "not privy" to letters Johnson received from inmates, such as plaintiff's).  According to Davis, prior to the incident of October 4, 2010, her only awareness of tensions involving plaintiff and Geller was through an incident report pertaining to September 23, 2010, which indicated that Torry, Geller and plaintiff, while locked in their respective cells, had been arguing through vents. Davis Dep. at 56.

Plaintiff testified that Davis told her that she was being placed on administrative segregation "because of the letter [plaintiff] had written."  King. Dep. at 41.  Viewed in the light most favorable to plaintiff, at the very least Davis was aware that plaintiff had written a letter that resulted in her transfer.  *See id.*  Notably, however, the record does not reveal whether Davis was aware that plaintiff's letter pertained to Geller.

In addition, without referencing Davis by name, but citing Davis's deposition in support, plaintiff asserts in her Opposition: "Defendants returned King to A-pod where they knew Torry and accused murderer Geller were housed without taking a single action to ensure her safety. Between the date of King's release from administrative segregation and the date of the attack, Defendants took no action whatsoever to determine whether the conflict between these inmates had subsided." Opp. at 17 (citing Davis Dep. at 15-16).

However, regardless of Davis's precise knowledge concerning plaintiff's concerns and whether they pertained to Geller, the uncontested facts make clear that plaintiff was placed in administrative segregation for her own safety, and then sought to leave because she felt safe returning to A-Pod. Specifically, plaintiff wrote Captain David on September 25, 2010, requesting to be removed from administrative segregation. King Dep. at 45-47. Although that letter is not a part of the record, plaintiff testified at her deposition that she wrote "about Torry and I having the discussion the morning before, and that she said that she didn't have any problems with me." King Dep. at 47. Moreover, plaintiff confirmed at her deposition that, at the time, she had genuinely believed Torry, and had also believed that it was safe for her to return to A-Pod, even with Torry and Geller present. *Id.* at 47-48. Plaintiff's deposition testimony demonstrates that it was Davis who brought a release form to plaintiff, which she signed, indicating that plaintiff felt safe to leave administrative segregation. *See* King Dep. at 48.

Davis also spoke with plaintiff on October 4 during the mediation involving plaintiff and Torry, which occurred before the altercation between plaintiff and Geller. Davis Dep. at 51. However, plaintiff points to no evidence suggesting that Geller's name arose during the mediation. Based on Torry's conduct at the mediation, Davis responded reasonably by assigning Torry to B-Pod, thus separating her from plaintiff. But, there is no indication that Davis either

should have or actually did infer that any hostility of Torry toward plaintiff should be imputed to Geller as well. Even when viewing the facts in the light most favorable to plaintiff, the evidence cannot sustain a finding that any defendant actually perceived a risk that *Geller* posed to plaintiff, let alone that they "recognized that [their] actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee*, 372 F.3d at 303 (quoting *Rich*, *supra*, 129 F.3d at 340 n.2).

In my view, the three remaining defendants could be faulted, at most, for negligence in failing to verify or investigate plaintiff's safety between late September and October 4, 2010.[17] Yet, it is well settled that negligence does not amount to "deliberate indifference" in the context of a failure-to-protect claim. *See, e.g.*, *Brown*, *supra*, 240 F.3d at 390 (affirming summary judgment for defendant officer who admitted that he "took less action than he could have, and by his own admission, should have" because, at most, conduct was negligent).

*Dale*, 548 F.3d 563, a Seventh Circuit case, is instructive. In *Dale*, the court upheld summary judgment for defendants where the inmate plaintiff, an informant, "could have remained in protective custody if he wanted," but chose not to. *Id.* at 570. The court acknowledged that, given the "limited social opportunities," protective custody "may not have been the most pleasant of experiences"; nevertheless, "it would have eliminated the risk of an attack." Accordingly, the court concluded: "Prison officials do not violate the Eight[h] Amendment because the mode of protection they offer does not sit well with a prisoner. Rather, if they offer reasonable protection from the threat, they have done their duty." *Id.*; *see also id.* at 571 (where inmate declines to be placed in protective custody, prison officials who do not transfer inmate are at most negligent and thus cannot be held liable under Eighth Amendment).

---

[17] This comment should not be construed to suggest that any of the defendants was actually negligent.

Here, the record is devoid of any suggestion that plaintiff raised concerns about Geller to any MCCF official in the days preceding the incident of October 4, 2010, either during the mediation or otherwise. *See Dale*, 548 U.S. at 570 (court "cannot emphasize enough the prisoner's responsibility to furnish information" to prison officers regarding specific threats). Further, no evidence exists that any defendant was on notice of escalating tensions between Geller and plaintiff at any time after September 25, when plaintiff asked to leave administrative segregation and believed she could return safely to A-Pod, even with Geller and Torry present.

## 3. Conduct by MCCF officials not involving remaining defendants

Certain knowledge or conduct involving MCCF officials cannot be attributed to any of the three defendants, even when the facts are viewed in the light most favorable to plaintiff. Such is the case with several incidents involving prison officials who are not among the three remaining defendants, as there is no indication that any defendant learned of the facts at a time when they could have, or should have, intervened. Under the "deliberate indifference" test articulated in *Farmer*, no grounds exist for attributing responsibility to defendants where the facts, viewed in plaintiff's favor, do not show "'that the defendants *actually knew of* and *disregarded* a substantial risk of serious injury to the detainee . . . .'" *Parrish ex rel. Lee*, 372 F.3d at 303 (citation omitted).

Of import here, the doctrine of respondeat superior does not apply in § 1983 claims. *See Monell v. New York Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Rather, individual liability must be based on personal wrongdoing or supervisory actions that violate constitutional norms. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994); *Wright v.*

*Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal*, 118 F.3d 1416, 1423 (10th Cir. 1997).

To establish supervisory liability against a warden or others under § 1983, a plaintiff must show: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799. As to the first element, the *Shaw* Court said, *id.* (internal citations omitted):

> To satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. . . . Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.

Here, plaintiff first alleges that, while in her cell during 24-hour lockdown on September 23, 2010, "and being continually threatened by Torry and Geller, she pleaded with officers to intervene, but was rebuffed." Opp. at 17 (citing King Dep. at 32). Plaintiff's testimony, however, establishes that the officer on duty was a "Ms. Baker," who is not a defendant in this action. *See* King Dep. at 32. Nor does plaintiff point to any evidence suggesting that any of the three remaining defendants was aware of her requests for intervention at that time. At least one defendant, Davis, learned of those events, but did so only later, upon receiving an incident report indicating that Torry, Geller, and plaintiff had been arguing through vents while on lockdown. Davis Dep. at 56. The events that occurred during the 24-hour lockdown preceded plaintiff's

transfer to administrative segregation on the afternoon of September 24, 2010. *See* King Dep. at 37. Accordingly, the record indicates that MCCF officials took action to protect plaintiff around that time.

Second, plaintiff notes in her Opposition that, while a guard was escorting her from the mediation to her cell on October 4, 2010, to retrieve "jail mail" letters that Torry sent to her, other inmates saw plaintiff carrying the letters, and plaintiff could hear them saying that she was turning in the letters as "retaliation" against Torry. Opp. at 5 (citing King Dep. at 75-76). However, the officer who had accompanied plaintiff to her cell—an Officer Frazier—did not remain in the mediation. *See* King Dep. at 75. Even if Officer Frazier could be faulted for failing to recognize and act upon a risk to plaintiff based on what other inmates supposedly observed, Officer Frazier is not a defendant. As for the three defendants, plaintiff points to no evidence that they learned from Officer Frazier, or otherwise, either that other inmates had seen plaintiff retrieving the letters, that Geller was among those inmates, or that the inmates had assumed, mistakenly, that plaintiff was surrendering the letters on her own initiative in retaliation against Torry.

Third, plaintiff's claim is also premised on a failure to protect her once the altercation began. Opp. at 18. According to plaintiff, the guard who was present, Officer Tarner, "showed no immediate concern for King's safety," "nonchalantly walked into the day room without any sense of urgency or concern for King's well-being," and observed the altercation "from afar as the inmates fought and made no effort to intervene even while Geller dragged King across the floor and repeatedly punched her." Opp. at 18 (citing Opp. Exh. E and F). Critically, however, the only prison official present at the start of the altercation, and whose conduct plaintiff challenges—Officer Tarner—is not a defendant. Nor is there any indication that any defendant

knew of the altercation at the outset. At the most, defendants' liability can be premised on their culpability in allowing Geller and plaintiff to remain together in A-Pod, with the level of supervision provided, but not for the response that followed once the physical altercation began.

Further, plaintiff argues that, notwithstanding defendants' awareness of threats to plaintiff's safety, MCCF did not provide "heightened security" in the day room, including by having a guard physically present in day room itself, rather than relying on the guard watching the inmates through a window. *See* Opp. at 18. Even assuming that MCCF should have stationed a guard within the room itself, plaintiff points to no evidence that any of the three defendants would have been responsible for making that decision. Nor would failing to do so amount to "deliberate indifference," rather than negligence, which is not actionable.[18]

Under the circumstances presented here, summary judgment for defendants is warranted as to the failure-to-protect claim.

### C. Due Process Claim Concerning Adjustment Hearing

Plaintiff contends that she was denied procedural due process in connection with her adjustment hearing. In asserting that defendants are entitled to summary judgment, defendants argue that plaintiff does not identify a deprivation of liberty that would trigger due process

---

[18] Defendants also argue that, "[t]o the extent plaintiff claims that she was not properly classified, or that she should not have been housed with Geller, there is no evidence to support such a claim." Mem. at 41. Because plaintiff pursues no such claim concerning her assigned security level in her Opposition, I need not address the issue of plaintiff's classification. *See, e.g.*, *Ferdinand-Davenport*, *supra*, 742 F. Supp. 2d at 777; *Mentch*, *supra*, 949 F. Supp. at 1247.

Notably, defendants invoke qualified immunity only once in connection with plaintiff's failure-to-protect claim, and do so only with respect to plaintiff's classification. *See* Mem. at 42 ("Defendants would be entitled to qualified immunity because they were performing a discretionary function and there is no evidence to establish that the Plaintiff's classification, or her housing assignment, were done in violation of any clearly established statutory or constitutional right of which a reasonable person in Defendants' position would have known."). Because plaintiff abandoned any challenge to her security classification, I need not discuss qualified immunity in connection with plaintiff's failure-to-protect claim.

rights; that in any event plaintiff was afforded all procedural protections that due process requires; that defendants are entitled to qualified immunity; and that summary judgment is warranted to the extent plaintiff brings suit against defendants in their official capacities. Mem. at 22-34.[19] Plaintiff counters with a host of challenges to defendant Johnson's handling of her adjustment hearing, which plaintiff maintains did not comply with either "MCCF's policy" or "long-established procedural due process law." Opp. at 8.

1. Due process rights in prison disciplinary hearings

The basic due process standards applicable to a prison disciplinary proceeding are set forth in *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). As the Supreme Court explained in *Wolff*, although prisoners "may not be deprived of life, liberty, or property without due process of law," their due process rights remain "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Id.* Accordingly, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.*

Applying those principles, the Supreme Court held in *Wolff* that a prisoner facing a disciplinary hearing is entitled to: (1) written notice of the charges, at least 24 hours before the disciplinary hearing; (2) an opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; and (3) a "written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action" imposed. *Id.* at 564-66 (quotation marks and citation omitted). Nevertheless, inmates are not entitled to a right of confrontation, nor are they

---

[19] Defendants move for summary judgment in connection with the due process claim as to all three defendants. *See* Mem. at 29 n.21. Plaintiff's Opposition, however, addresses only the conduct of Johnson. *See* Opp. at 8-15.

guaranteed a right to counsel. *Id.* at 567-70;[20] *see Baxter v. Palmigiano*, 425 U.S. 308, 322-23 (1976); *Brown v. Braxton*, 373 F.3d 501, 505-06 (4th Cir. 2004). Further, substantive due process is satisfied where a disciplinary hearing decision is based upon "some evidence." *Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985).

Regarding an inmate's opportunity to call witnesses where no undue hazard to "institutional safety or correctional goals" exists, the Court emphasized in *Wolff*: "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority . . ." 418 U.S. at 566. To that end, a prison official may refuse to call a witness for reasons including "irrelevance, lack of necessity, or the hazards presented in individual cases." *Id.*; *see Brown v. Braxton*, 373 F.3d at 505 ("[A]fter *Wolff*, it was clearly established that prison officials had the discretion to deny witness requests, where legitimate penological interests justified excluding a witness."); *see also Ferreira v. Dubois*, 963 F. Supp. 1244, 1253 n.16 (D. Mass. 1996) ("Prison officials therefore have the discretion to deny live witness testimony where such testimony is irrelevant or unnecessary.").

In *Ponte v. Real*, 471 U.S. 491, 497 (1985), the Supreme Court built upon its holding in *Wolff*, stating:

> [P]rison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but . . . they may do so either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may

---

[20] Specifically, the Court concluded in *Wolff* that rights to confrontation or cross-examination present "greater hazards to institutional interests," and thus declined to require those rights in connection with prison disciplinary proceedings. 418 U.S. at 567-68. The Court also refused to recognize a general right to counsel at such proceedings, allowing only illiterate inmates or those facing particularly issues to consult with a sufficiently competent inmate or staff member. *See id.* at 569-70.

choose to explain it "later." . . . [S]o long as the reasons are logically related to "institutional safety or correctional goals," the explanation should meet the due process requirements as outlined in *Wolff*.

The *Ponte* Court acknowledged that, given the "significant limitations on an inmate's right to call witnesses," coupled with the deference to prison officials' judgment recognized in *Wolff*, "it may be that a constitutional challenge to a disciplinary hearing . . . will rarely, if ever, be successful." *Id.* at 499. As the Fourth Circuit explained in *Brown v. Braxton*, 373 F.3d at 505, "*Wolff* establishes beyond doubt" that disciplinary hearing officers "may decide that legitimate penological interests justify the denial of an individual inmate's witness request, and their decisions are not to be lightly second-guessed by courts far removed from the demands of prison administration." Indeed, "[d]eference to prison administrators may mean upholding a denial of a request even in situations [in which] the 'denied witness *might* have provided testimony to exculpate [the inmate],' or where the reviewing court might have ruled differently had it been conducting the hearing." *Shuck v. Bledsoe*, 2005 WL 1862666, at *2 (W.D. Va. Aug. 3, 2005) (quoting *Afrika v. Selsky*, 750 F. Supp. 595, 601 (S.D.N.Y. 1990) (emphasis in *Afrika*)).

Nevertheless, the *Ponte* Court expressly rejected an approach that would "place the burden of proof on the inmate to show why the action of the prison officials in refusing to call witnesses was arbitrary or capricious." 471 U.S. at 499. Accordingly, *Ponte* has been read to hold that "'the burden of persuasion as to the existence and sufficiency of such institutional concerns [justifying the denial of an inmate's request to call witnesses] is borne by the prison officials, not by the prisoners.'" *Smith v. Massachusetts Dept. of Correction*, 936 F.2d 1390, 1399-1400 (1st Cir. 1991) (quoting *Grandison v. Cuyler*, 774 F.2d 598, 604 (3d Cir. 1985); modification in *Smith*). *Accord Bostic v. Carlson*, 884 F.2d 1267, 1273 (9th Cir. 1989) ("The

burden of proving adequate justification for denial of a request to present witnesses rests with the prison officials.").

2. Liberty interest

As an initial matter, defendants argue that plaintiff's sentence of 30 days in disciplinary segregation "does not invoke a liberty interest for which due process protections attach." Mem. at 26. Subsequent to *Wolff*, the Supreme Court held that "discipline in segregated confinement [does] not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin v. Conner*, 515 U.S. 472, 486 (1995). Although the Fourth Circuit has not addressed the issue, other circuits have concluded that *Sandin* governs the rights of convicted prisoners but does not apply to pretrial detainees. *See, e.g.*, *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012); *Surprenant v. Rivas*, 424 F.3d 5, 17 (1st Cir. 2005); *Rapier v. Harris,* 172 F.3d 999, 1003 n.2 (7th Cir. 1999); *Mitchell v. Dupnik*, 75 F.3d 517, 523 (9th Cir. 1996). Moreover, in *Sandin* the Supreme Court distinguished its decision in *Bell v. Wolfish*, on the ground that *Bell* "dealt with the interests of pretrial detainees and not convicted prisoners." 515 U.S. at 484. In my view, defendants fail to establish that plaintiff, as a detainee, lacked a liberty interest in avoiding the penalty resulting from her adjustment hearing.

3. Due process

According to defendants, even if a liberty interest is implicated such that plaintiff's procedural due process rights were triggered, the undisputed facts show that plaintiff received sufficient procedural protection. *See* Mem. at 31. As noted, plaintiff raises several challenges to her adjustment hearing, including that she was denied her right to call live witnesses and to present witness questions, in violation of both MCCF policy and constitutional due process standards. Opp. at 8.

Plaintiff's due process claims center on Dana Johnson, another MCCF inmate who plaintiff identified as one of two witnesses she wished to call on her behalf. Defendant Johnson did not allow Dana to testify at plaintiff's adjustment hearing on October 6, 2010. Plaintiff argues that defendant Johnson has not established how calling Dana "would have been unduly hazardous to institutional safety or correctional goals." Opp. at 10. Although plaintiff acknowledges that the MCCF Inmate Discipline Policy requires witnesses to be questioned in private to prevent witness intimidation, she maintains that defendant Johnson has provided no explanation, either in her deposition testimony or her post-hearing report, why she refused to call Dana as a witness during the adjustment hearing. Opp. at 10. Plaintiff raises additional challenges to the conduct of the adjustment hearing, relating to defendant Johnson's alleged failures to obtain witness questions that plaintiff had prepared, to advise plaintiff regarding Lemus's unavailability so as to enable her to identify a substitute witness, and to inform her about the content of Dana's interview statements. *Id.* at 10-11.

In the Recommendation and Report that defendant Johnson completed shortly after the hearing, signed on October 7, 2010, she explained, in relevant part: "Ms. Fields requested two witnesses, inmates Dana Johnson 10-2220 and Dina Lemus 10-5725. Ms. Johnson was interviewed prior to the hearing, however Ms. Lemus was not available, she was out on a temporary release as [of] 10/05/2010." Mem. Exh. 10; Opp. Exh. N. However, the Recommendation and Report did not recount what Dana had stated in her interview. Nor did the Recommendation and Report address the reason for the omission of the substance of Dana's interview from the report, or why Dana did not testify. *See id.*

At her deposition, Johnson explained her decisions concerning Dana. Among other issues, Johnson addressed her efforts before the hearing to interview the two witnesses plaintiff

had identified.  Johnson's interview of Dana was informal, and Johnson said she likely would

have taken notes "on a Post-it."  *Id.* at 40.  Regarding Johnson's discussion with Dana, the

following deposition colloquy is relevant, *id.*:

> [Plaintiff's Counsel:] What did Dana Johnson tell you?

> [Defendant Johnson:] That she just observed -- what she observed in the fight, what happened, that there was a verbal argument between the two of them and that they basically both got up and came to each other.

> [Plaintiff's Counsel:] Did Dana Johnson assign responsibility for provocation?

> [Defendant Johnson:] I wouldn't say that she did, no.  Based on what she said, I would probably say that they both were equally provoking to each other.

Johnson also identified safety-related concerns as the reason for her decisions concerning

Dana.  *See* Johnson Dep. at 44-45:

> [Defense Counsel:] Now, in the adjustment portion of this case, when you interview witnesses for this kind of incident like in this case, you don't put those witnesses from the inmates into those reports, isn't that right[?]

> [Defendant Johnson:] Right.

> [Defense Counsel:] And as I understand it, that's because the inmate gets a copy?

> [Defendant Johnson:] Right.  So I don't -- what you're asking me is I don't necessarily put their full statement into the body of the report.

> [Defense Counsel:] And why is that?

> [Defendant Johnson:] Because we don't want to incite or inflame tensions because, again, they get a copy of the report, the inmates get copies.

> [Defense Counsel:]  So whatever opinions you would have formulated about the incident of October 4, 2010 that you would have put in the report would not have contained direct statements from other inmates because of safety issues because the plaintiff would get a copy of that report?

> [Plaintiff's Counsel:] Objection.

[Defendant Johnson:] Right.

*   *   *

[Defense Counsel:] [E]ven if plaintiff had given you questions to ask of the witnesses, those witnesses don't appear at the adjustment hearing for the same safety reasons we just talked about; isn't that right?

[Defendant Johnson:] That's correct.

Plaintiff challenges the sufficiency of Johnson's explanations on several grounds.

For one, plaintiff asserts that "[a]ny 'safety concerns' Defendant Johnson might advance now are post hoc rationalizations premised on speculation and were not documented at the time of the hearing." Opp. at 11-12. That argument echoes the dissent in *Ponte*, in which Justice Marshall warned that allowing prison officials to "explain in court, many months or years after a disciplinary hearing, why they refused to hear particular witnesses" invites "*post hoc* courtroom rationalizations." 471 U.S. at 504 (Marshall, J., dissenting). The *Ponte* majority, however, made clear that due process does not require a contemporaneous explanation. Rather, a subsequent explanation, of the type Justice Marshall criticized, and which plaintiff now disputes, may be sufficient. 471 U.S. at 497.

As for the substance of Johnson's testimony, plaintiff challenges the adequacy of Johnson's reason why "it would have been *unduly* hazardous to institutional safety or correctional goals to call witnesses during King's disciplinary hearing." Opp. at 11. Johnson made clear that, under MCCF policy, charged inmates are barred from directly questioning witnesses at an adjustment hearing. Johnson Dep. at 37-38; *see* MCCF Inmate Discipline Policy ("In order to lessen the possibility of witness intimidation, the accused inmate shall not be permitted to directly question the witnesses."). As indicated, Johnson confirmed that, when she "interview[s] witnesses for *this kind of incident like in this case*," she "do[esn't] put those witnesses from the inmates into those reports[.]" Johnson Dep. at 44 (emphasis added). Further,

Johnson justified her refusal to make plaintiff aware of Dana's testimony by citing a desire to avoid "inflam[ing] tensions." *Id.* at 45. This justification is consistent with the concern for "institutional safety or correctional goals" endorsed in *Wolff*, 418 U.S. at 566. *See also Ponte*, 471 U.S. at 497.[21] And, in *Brown v. Braxton*, 373 F.3d at 505, the Fourth Circuit made clear that decisions of hearing officers must not be "lightly second-guessed by courts far removed from the demands of prison administration."[22]

In addition to challenging Dana's exclusion and the sufficiency of Johnson's explanations, plaintiff complains that Dana was never asked certain questions that plaintiff had drafted before the hearing. However, plaintiff does not identify an actionable due process violation based on any failure by Johnson to obtain witness questions from plaintiff.

---

[21] Defendants argue that, because "Dana Johnson's statement did not vindicate Plaintiff as Plaintiff clearly hoped when identifying her as a witness," Johnson's stated security concerns were "valid and justified." Mem. at 25. However, Johnson did not articulate that specific concern at her deposition. Although a prison official may refuse to call witnesses due to their "irrelevance" or a "lack of necessity," Johnson did not invoke those particular reasons in her testimony. *See Wolff*, 418 U.S. at 566.

[22] In *Brown v. Braxton*, 373 F.3d at 505, the Fourth Circuit observed: "*Wolff* did leave open an important question that has divided the circuits: whether prison officials had to consider witness requests on a case-by-case basis, or whether they could formulate regulations designed to deal with such requests categorically." It noted that, in *Dalton v. Hutto*, 713 F.2d 75, 78 (4th Cir. 1983), the Court had concluded that *Wolff* deemed "*per se* proscriptions against the calling of certain categories of witnesses" to be a violation of due process. *Id.* Notably, the policy at issue in *Dalton* deprived inmates of a right to call any witness who would not appear voluntarily. *See Dalton*, 713 F.2d at 77-78. Although the Fourth Circuit acknowledged in *Brown* that, in the wake of *Ponte*, "there has been a growing recognition that prisons may develop witness request policies for sensible reasons," the Court declined to revisit its decision in *Dalton* at that time. *See* 373 F.3d at 505 n.*; *see also, e.g.*, *McGuinness v. Dubois*, 75 F.3d 794, 799-800 (1st Cir. 1996); *Powell v. Coughlin*, 953 F.2d 744, 749 (2d Cir. 1991).

It is not clear that Johnson failed to consider the pertinent circumstances when she disallowed Dana's live testimony. Nor is it apparent that categorically denying live testimony from witnesses to certain violent events, such as the inmate-on-inmate altercation that occurred here, is improper under the law of this Circuit. In any event, as explained below, plaintiff failed to identify any violation of a "clearly established" constitutional right.

The MCCF Inmate Discipline Policy stated that, although an accused inmate cannot question witnesses directly, "members of the Adjustment Committee shall question the witness in private and include any questions raised by the accused." Plaintiff points to a note she wrote to Johnson, to which plaintiff says Johnson did not respond. Opp. at 10 (citing King Aff. ¶ 5 and Opp. Exh. M). However, the note, an Inmate Request Form dated October 4, 2010, made no specific mention of witness questions. Instead, it refers to the security video and asks that Johnson speak with plaintiff before the adjustment hearing. Opp. Exh. M. At plaintiff's deposition, she indicated that she thought, until the adjustment hearing, that she had a right to question the witnesses herself during the proceedings. King Dep. at 111-12. That testimony suggests that, until learning at the hearing that she had no such right, plaintiff would not have attempted to provide Johnson with questions that plaintiff believed, albeit erroneously, that she herself could pose to the witnesses.

As for the actual questions plaintiff drafted in advance of her hearing, those questions indicate that she sought to elicit testimony on issues such as whether she or Geller stood up first, who struck the other first, and whether plaintiff had an adequate opportunity to retreat from Geller. *See* Mem. Exh. 7. However, according to Johnson's description of Dana's comments, Dana attributed equal responsibility to plaintiff and Geller for provoking the incident. *See* Johnson Dep. at 40. And, Officer Tarner's Adjustment Report reflected that both plaintiff and Geller were striking one another during the altercation. *See* Opp. Exh. F and Mem. Exh. 13.

Notably absent from the record is any indication from plaintiff as to how Dana's testimony would have supported plaintiff's account or changed the outcome of the adjustment hearing. In particular, plaintiff has not offered an affidavit, deposition testimony, or a proffer establishing what Dana would have said. In light of those omissions, the record lacks any

evidence that, had Dana testified at the adjustment hearing or otherwise been asked the questions plaintiff had prepared, her testimony would have corroborated plaintiff's version of the events. *See Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003) (holding potential due process violation harmless where accused inmate could not explain how witness's live testimony would have helped him); *McGuinness v. Dubois*, 75 F.3d 794, 800 (1st Cir. 1996) (holding lack of live testimony harmless where inmate was able to present defense, supported by witness affidavits); *Randall v. Pettiford*, 2011 WL 587003, at *4 (D.S.C. Jan. 21, 2011) (noting that plaintiff failed to specify how he was prejudiced by lack of live testimony, in light of other factual findings); *Joyner v. Combs*, 2007 WL 2693194, at *5 (W.D. Va. Sept. 13, 2007) (noting that plaintiff challenging exclusion of witnesses failed to "submit any affidavits from these witnesses, indicating the content of their potential testimony or their willingness to complete a witness statement on his behalf, consistent with his allegations").

Moreover, the security video of the October 4 altercation between plaintiff and Geller casts further doubt on whether additional witness testimony would have absolved plaintiff from responsibility for the altercation. *See* Mem. Exh. 12 (security video from A-Pod). As the Supreme Court explained in *Scott v. Harris*, 550 U.S. 372, 380 (2007), when "opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence contained in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ." To be sure, *Scott* does not grant a court license to reject outright a party's account where "documentary evidence, such as a video," merely "offers *some* support for [the other side's] version of events." *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (emphasis in original); *see Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013). At the same time, under *Scott*, "[i]ncontrovertible evidence relied on by the moving party, such

as a relevant videotape whose accuracy is unchallenged, should be credited by the court" when resolving a motion for judgment as a matter of law, "if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).

As discussed above, the security video of the October 4 incident portrays Geller and plaintiff exchanging hostile words while seated at adjoining tables in the day room. Geller arose first from her seat, but plaintiff stood up almost simultaneously, and the two argued face-to-face, with plaintiff making no obvious attempt to retreat until she was struck by Geller. Even when viewed in the light most favorable to plaintiff, the video lends little support to the notion that testimony from Dana or other witnesses would have resulted in some other outcome at plaintiff's adjustment hearing.[23]

Plaintiff raises arguments concerning several other aspects of her hearing, but she does not establish how the alleged violations constitute an actionable due process claim. She contends that Johnson "fail[ed] to communicate the substance of Dana Johnson's interview" to her. Opp. at 12. The Opposition cites three out-of-circuit cases for the proposition that, "[i]f witnesses are interviewed outside the accused inmate's presence, due process requires that she be informed of what they said." Opp. at 9. The first case, *Espinoza v. Peterson*, 283 F.3d 949, 953 (8th Cir. 2002), merely upheld the decision of prison officials to obtain a written statement from an inmate witness as an alternative to hearing live testimony, where the witness was incarcerated at an out-of-state facility. In *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989), the court concluded that

---

[23] At her deposition, Johnson testified that, although the security video would have been available for her to view around the time of the hearing, she could not recall whether she had done so before preparing her Recommendation and Report shortly after the hearing. *See* Johnson Dep. at 41-42. Johnson added that she had viewed the video at some point in time subsequent to the incident. *Id.* at 41. Regardless of whether Johnson viewed the video before making her adjustment determination as to plaintiff, the security video is relevant to this Court's assessment of whether plaintiff suffered actual prejudice as a result of the alleged due process violations.

a hearing officer's failure to inform the charged inmate of the testimony of either the accusing officers or an inmate witness violated his right, established pursuant to pre-*Wolff* Second Circuit case law, that an inmate has a right to be informed about and comment upon the evidence against him. The Second Circuit emphasized the lack of any argument by the hearing officer that evidence was withheld from the inmate for reasons of institutional safety. *Id.* The court also rejected the inmate's argument that he had a right to be present for testimony offered by exculpatory witnesses and, in so concluding, did not suggest that the inmate had a right, absolute or otherwise, to know the content of those witnesses' testimony. *See id.* at 48. Similarly, *Daigle v. Hall*, 387 F. Supp. 652 (D. Mass. 1975), did not address the rights of an inmate to learn of adverse testimony in light of security concerns of the type recognized in *Wolff*. *See id.* at 660. In short, these cases do not establish a due process violation where, as here, the relevant witness was one identified by the charged inmate, the record does not indicate that plaintiff lacked sufficient notice of the charges and evidence against her, and the hearing officer justified her actions with valid, safety-based reasons.

In addition, plaintiff argues that Johnson violated the MCCF Inmate Discipline Policy by failing "to document any reason for failing to call Dana Johnson in person as required by the prison's policy[.]" Opp. at 10. The relevant portion of the policy states: "Unavailable witnesses may be asked to submit written statements; however, there must be good reason for not calling a witness in person. The justification of this action shall be documented." Mem. Exh. 8. As an initial matter, it is unclear whether this documentation requirement applies only to unavailable witnesses (such as Lemus, whose absence was documented in Johnson's report), or also to witnesses excluded from hearings due to security concerns.

Even assuming that the requirement applies to a witness such as Dana, who was available but excluded on some other basis, it would exceed the constitutional due process requirements of *Ponte*, which endorses a later, in-court explanation as valid. In light of *Ponte*, a mere failure to comply with a policy requiring contemporaneous documentation of the reason for declining to allow live testimony cannot, on its own, amount to a constitutional violation. *See Outlaw v. Jones*, 2012 WL 2568163, at *3 (D. Md. June 29, 2012) ("[T]o the extent that prison personnel somehow failed to follow their own policies or procedures, such failure, standing alone, does not amount to a constitutional violation."); *Smith v. Simpkins*, 2012 WL 831934, at *1 (D. Md. Mar. 9, 2012) ("The failure of prison officials to follow their own policies or procedures, standing alone, does not amount to a constitutional violation."); *Fitchette v. Collins*, 402 F. Supp. 147, 156 (D. Md. 1975) (absent a showing of prejudice, a failure by prison officials to follow their own rules and regulations would not amount to a constitutional due process violation); *see also, e.g.*, *Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009) (per curiam) ("[A] prison official's failure to follow the prison's own policies, procedures or regulations does not constitute a violation of due process, if constitutional minima are nevertheless met.") (internal quotation marks and citation omitted); *Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation.").

Further, plaintiff complains that Johnson neither advised her as to Dina Lemus's unavailability, nor allowed plaintiff to name an additional witness to testify instead. Opp. at 10-11. Regarding the permissible number of inmate witnesses at an adjustment hearing, Johnson testified that, depending on their relevance, inmates are generally advised that two or three witnesses are appropriate. *See* Johnson Dep. at 38. However, plaintiff does not allege that she attempted to call more than two witnesses or that she was barred from doing so. Although the

security video indicates that several other inmates were present for the altercation, plaintiff chose to select only Lemus and Dana. *See* Mem. Exh. 12 (security video from A-Pod). Accordingly, as with other aspects of her due process allegations, plaintiff does not raise a viable due process claim based upon Johnson's failure to invite her to identify an alternate witness.

## 4. Qualified immunity[24]

Defendants argue that they are entitled to qualified immunity with respect to plaintiff's due process claim. Mem. at 32-34. Under federal law, "[t]he doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir.) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)), *cert. denied*, ___ U.S. ___, 133 S.Ct. 789 (2012). *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013). "Qualified immunity extends to protect officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.) (en banc), *cert. denied*, ___ U.S. ___, 132 S.Ct. 781 (2011)); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

A qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the

---

[24] In her Opposition, plaintiff indicates that she is pursuing an individual capacity suit against Johnson. Opp. at 15. Accordingly, I need not address defendants' argument that they are entitled to summary judgment to the extent plaintiff is pursuing official-capacity claims against them, *see* Mem. at 29-31, because plaintiff has abandoned that contention.

situation he confronted.'" *Merchant*, 677 F.3d at 662 (citation omitted). The "two inquiries . . .

may be assessed in either sequence." *Id.* at 661-62; *accord Pearson*, 555 U.S. at 236 (2009)

(judges are "permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed

in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt*

*v. Millender*, ____ U.S. ____, 132 S.Ct. 1235, 1245 (2012) (citing *Anderson v. Creighton*, 483

U.S. 635, 639 (1987)). "To be clearly established, a right must be sufficiently clear that 'every

reasonable official would [have understood] that what he is doing violates that right.' In other

words, 'existing precedent must have placed the statutory or constitutional question beyond

debate.'" *Reichle v. Howards* ____ U.S. ____, 132 S.Ct. 2088, 2093 (2012) (quoting *Ashcroft v.*

*al-Kidd*, 563 ___ U.S. ___, 131 S.Ct. 2074, 2078, 2083 (2011)) (some internal quotation marks

and citations omitted).

If the law at the time of the alleged violation was not "clearly established," the official

will be entitled to qualified immunity, because "an official could not reasonably be expected to

anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law

forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other

hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a

reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

In determining whether a right was clearly established, courts in this Circuit "'ordinarily need

not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court

of the state in which the case arose,'" as of the date of the conduct at issue. *Doe ex rel. Johnson*

*v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citations omitted), *cert. denied*, ___ U.S. ___, 131 S.Ct. 392 (2010).

Other courts have granted qualified immunity in the context of inmate due process claims concerning a failure to call a witness at a disciplinary hearing. *See, e.g.*, *Barnes v. Henderson*, 628 F. Supp. 2d 407, 413 (W.D.N.Y. 2009) (qualified immunity proper because it was clearly established that inmate's right to call witnesses was limited and "that a hearing officer has discretion to deny an inmate's witness requests on a number of grounds"); *Ferreira*, *supra*, 963 F. Supp. at 1258-59 (granting qualified immunity to hearing officer and noting that it was clearly established at time of hearing that officer could provide reasons for denying live witness testimony at some subsequent point in time).

Under *Ponte*, a hearing officer's justification for excluding a witness may be offered after the fact. At her deposition, Johnson identified safety-based reasons of the sort recognized by *Wolff* and *Ponte* as the basis for her decisions concerning plaintiff's adjustment hearing, including the decision not to call Dana as a live witness. *See* Johnson Dep. at 44-45. Moreover, plaintiff has identified no "clearly established" constitutional right that Johnson violated in connection with the adjustment hearing. Accordingly, even if Johnson's conduct could be construed as inconsistent with *Wolff*, *Ponte*, and the law of this Circuit—which, in my view, it was not—Johnson is entitled to qualified immunity.

## IV. Conclusion

For the foregoing reasons, defendants' Motion is granted. A separate Order follows, consistent with this Memorandum Opinion.

Date:  February 19, 2014

_____/s/_____
Ellen Lipton Hollander
United States District Judge